**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

QUINCY LUNDY,

                          Petitioner,

     v.                                                                    9:21-CV-0899
                                                                                (GTS-DJS)
SUPERINTENDENT

                          Respondent.

**APPEARANCES:**                                    **OF COUNSEL:**

JODI L. MORALES, ESQ.
Attorney for Petitioner
The Law Office of Jodi Morales
888 Grand Concourse
Ste 1H
Bronx, New York 10451

HON. LETITIA JAMES                          MICHELLE ELAINE MAEROV, ESQ.
Attorney for Respondent                     Assistant Attorney General
New York State Attorney General
The Capitol
Albany, New York 12224

**DANIEL J. STEWART**
**United States Magistrate Judge**

<u>**REPORT-RECOMMENDATION AND ORDER**</u>

## I.    INTRODUCTION

Petitioner Quincy Lundy ("Petitioner") seeks federal habeas corpus relief pursuant to 28

U.S.C. § 2254.  Dkt. No. 1, Petition ("Pet."); Dkt. No. 4, Petitioner's Memorandum of Law in

Support of Petition.  Respondent successfully requested an extension of time to file a response

and permission to file an oversized memorandum of law.  Dkt. No. 6, Letter Motion (requesting

an extension); Dkt. No. 7, Text Order (granting request); Dkt. No. 9 (requesting permission to

file an oversized memorandum); Dkt. No. 10, Text Order (granting request).  Respondent

submitted a reply.  Dkt. No. 11, Response; Dkt. No. 11-1, Respondent's Memorandum of Law in

Opposition to Petition; Dkt. Nos. 12-1–12-6, State Court Records; Dkt. Nos. 13-1–13-2, State

Court Records.  Petitioner requested an extension of time to file a reply.  Dkt. No. 15, Motion

(requesting an extension); Dkt. No. 16, Text Order (granting request).  Petitioner subsequently

submitted a reply.  Dkt. No. 17, Traverse.

## II.    RELEVANT BACKGROUND

### A.  Indictment

In an Indictment filed May 9, 2014, Petitioner and Dron Lundy were charged with

Murder in the Second Degree, in violation of N.Y. PENAL LAW ("P.L.") § 125.25(1), and two

counts of Criminal Possession of a Weapon in the Second Degree, in violation of P.L. §

265.03(1)(b) and (3).  Dkt. No. 12-1 at 188-90.[1]  The Grand Jury found, on or about October 19,

2012: Petitioner and Dron Lundy: "aiding and abetting and being aided and abetted by each

other, intentionally caused the death of Walter Belle by shooting him in the chest[,]" and

Petitioner "possessed a loaded firearm intending to use the same unlawfully against Walter Belle

[and] . . . possessed a loaded firearm at a place other than his home or place of business, to wit: a

handgun."  *Id*. at 188-89.

### B.  Pre-Trial

As relevant here, Petitioner moved for an order severing his trial from that of his co-

defendant, Dron Lundy.  Dkt. No. 12-1 at 194.  Onondaga County Court denied Petitioner's

motion, finding Petitioner "ha[d] not shown that the core of his defense would be in

irreconcilable conflict with his co-defendant, or that this conflict alone would cause a significant

---

[1] All citations to the parties' submissions will refer to the pagination generated by CM/ECF, the Court's electronic filing system.

danger of leading the jury to infer their guilt" and there was no evidence of "a potential *Bruton* problem . . . [because] although both defendants gave statements to police, neither defendant have a statement that place[d] blame for the crimes charged on the other brother." *Id*. at 195-96 (citations omitted).

### C.  Jury Trial

The joint jury trial of Petitioner and Dron Lundy commenced on October 14, 2014, before Onondaga County Court ("County Court" or "trial court").  Dkt. No. 13-1 at 111.  A jury was selected and the parties delivered opening statements.  *See generally*, *id*. at 341-60.  The parties then presented their respective cases, the relevant portions of which are summarized below.

On October 19, 2012, around 8:00 p.m., Tamekia Hollister was in the hallway of her residence at 508 East Laurel Street smoking a cigarette with her mother, Beverly Laframboise. Dkt. No. 13-1 at 381-83.  Hollister recalled they sat in front of two opened double doors to the outside facing the sidewalk and East Laurel Street.  *Id*. at 383-84.  Hollister testified she observed "[t]wo black males . . . walking by" on the sidewalk, one wearing "a camouflage hoodie" and the other wearing "a black hoodie[.]"  *Id*. at 385-86.  Hollister explained the two men were talking towards Catherine Street and she was able to see them with the assistance of a street light.  *Id*. at 389-91.

Hollister identified Petitioner as the individual who walked by wearing the camouflage hoodie and co-defendant Dron as the individual who wore the black hoodie. Dkt. No. 13-1 at 391-92.  Hollister remained in the hallway as they walked by and "[a]bout a minute or two later [she] heard gunshots."  *Id*. at 393.  Hollister testified she heard "[a]bout five" gunshots "coming from down the street . . . towards Catherine" and she ran inside with

Laframboise.  *Id*. at 393-94.  After two or three minutes, Hollister went back outside where she observed "the defendants running back up the street."  *Id*. at 394-97.  Hollister testified the two "were running up the hill . . . Towards McBride" then entered "a white vehicle at the top of the corner" which she described as "a white Jeep with lettering on the side."  *Id*. at 397.  The witness explained the vehicle had been parked on East Laurel Street at the intersection with McBride, then "started driving off and it did a U-turn and went toward[s] McBride."  *Id*. at 399.

Beverly Laframboise testified she observed two individuals walk by her home while she was smoking in the stairway with Hollister.  Dkt. No. 13-2 at 328-30.  Laframboise testified one of the individuals was "tall" and the other "looked young."  *Id*. at 333.  Laframboise stated both individuals were African American but one had a lighter skin tone and the other a darker skin tone.  *Id*. at 334.

Jason Acevedo testified he went by the nickname "Peso" and had been friends with Walter Belle, who went by the nickname "Esco" for four or five years.  Dkt. No. 13-2 at 338-399.  Acevedo testified Belle resided at 644 Catherine Street in 2019, located at the corner of Catherine and Laurel Streets.  *Id*. at 40.  Acevedo stated he and Belle spent time with other friends at the residence, including "Ceto, Rock," also known as "Shevacki Bloodworth" and "Q." *Id*. at 41.  Acevedo also identified "Murk" as his cousin, Alfred Thomas.  *Id*.

Around 8:00 p.m. on October 19, 2012, Acevedo walked down Butternut Street towards Eliosco's grocery store, located at the corner of Laurel and Lodi, "[r]ight around the corner . . . maybe 15 feet" from the residence at 644 Catherine.  Dkt. No. 13-2 at 42-43.  As he approached the store, Acevedo "heard arguing around the corner" and recognized "[Belle] was arguing with Quincy."  *Id*. at 44.  Acevedo identified Petitioner as "Quincy Lundy" and stated he was familiar with him from prior "altercations . . . on Butternut."  *Id*. at 44-45.

Acevedo testified he walked towards the intersection of Catherine and Laurel Streets and "s[aw] three people walking across the street and [Belle], he was arguing with them."  Dkt. No. 13-2 at 45.  Acevedo stated "Shevacki" was talking with Belle in the driveway while Petitioner and the other two people stood in the street.  *Id*. at 46-47.  Acevedo testified the other two individuals were "wearing black hoodies" and one of the two "looked like [Petitioner's] brother Dron."  *Id*. at 47.  Acevedo stated Petitioner was also wearing "[a] black hoodie . . . and dark pants."  *Id*. at 49.

Acevedo testified he "asked [Belle] if he was good and [Belle] said yeah" and Petitioner and the other two individuals walked "across the street . . . away from the house."  Dkt. No. 13-2 at 51.  Acevedo clarified the three individuals crossed "Catherine" and proceeded "up the hill on Laurel" Street away from the intersection with Lodi.  *Id*. at 51-52.  Accordingly, Acevedo "starting walking back towards the store" when he "heard shots fired and . . . looked behind [him] to see who it was and [he saw] them firing down from the hill[.]"  *Id*. at 52.  Acevedo explained he saw "Quincy and his brother Dron and the third person" firing from up the hill and he "took off."  *Id*. at 52.  Acevedo confirmed he saw guns in the hands of both Petitioner and the individual he believed to be co-defendant Dron which he described as "chrome, small like deuce deuce .22 calibers."  *Id*. at 53.  Acevedo stated the individuals were firing shots from "the sidewalk" on Laurel "two or three" houses up the street from the corner of Laurel and Catherine. *Id*. at 54.

Syracuse Police Officer John Harkness testified he was dispatched to 644 Catherine Street at approximately 8:02 p.m. on October 19, 2012.  Dkt. No. 13-1 at 361-63.  Harkness stated he observed two males in front of the residence: one was "laying in the foyer . . . unconscious" and the other was "standing next to him."  *Id*. at 366.  Harkness explained he

learned Belle was the unconscious male and he had sustained "a gunshot wound to his upper left chest area just below his armpit." *Id*. Harkness also learned the other male, "Shevacki Bloodworth[,]" had "a grazed gunshot wound to his right shoulder area" but was "conscious, alert, [and] sp[oke] to officers on scene." *Id*. at 367.

Harkness recalled paramedics transported Belle to the hospital. Dkt. No. 13-1 at 367-68. Bloodworth was transported to the Criminal Investigations Division ("CID"). *Id*. at 369. Harkness assisted with a canvass of the surrounding area, the six hundred block of Catherine Street. *Id*. at 367. Harkness testified Belle was pronounced dead at the hospital at 8:50 p.m. *Id*. at 368.

Syracuse Police Detective Thomas Glauberman responded to 644 Catherine Street, at the corner of Catherine and Laurel, on October 19, 2012, in his capacity as an evidence technician and member of the crime scene unit. Dkt. No. 13-1 at 495-501. Glauberman documented the scene, capturing photographs which were admitted into evidence and used to generate a crime scene sketch. *Id*. at 503-09.

The following day, police collected "a 12-gauge shotgun" from the area at the top of the stairs inside of the residence at 644 Catherine Street. Dkt. No. 13-1 at 509. Glauberman testified the shotgun was loaded with five rounds. *Id*.

Syracuse Police Detective Terrence McGinn conducted a trajectory analysis at Catherine Street on October 20, 2012. Dkt. No. 13-1 at 564-69. McGinn located "a bullet hole above the door" of the main entrance to the duplex style house. *Id*. at 572. McGinn used "a trajectory rod" to extrapolate information about the flight of the projectile prior to contact with the building to determine "a general location whe[re] the weapon [that fired projectile] was discharged[.]" *Id*. at 573-74. McGinn also observed "an impact strike in the molding above . . . the interior door"

which led him to concluded "there were a minimum of two shots which were fired into 644 Catherine Street[.]"  *Id*. at 575.

When detectives "went up the hill to" the area McGinn identified as a location where a weapon had been discharged, they "immediately found two shell casings . . . on the sidewalk in front of 514 East Laurel Street."  Dkt. No. 13-1 at 576.  McGinn determined the recovered casings "were a .25 caliber[.]"  *Id*. at 578-79.  McGinn estimated the recovered casings were found "between a hundred and 120 feet" away from 644 Catherine Street.  *Id*. at 581.

Syracuse Police Detective Jeffrey Okon was assigned the investigation into the death of Belle.  Dkt. No. 13-1 at 949-50.  On October 21, 2012, Okon spoke to Hollister and Laframboise at 508 East Laurel Street.  *Id*. at 951.  Okon testified he attempted to locate Jason Acevedo in November of 2012, but Acevedo did not want to provide information related to the investigation.  *Id*. at 954-56.  Okon also conducted multiple interviews of Bloodworth, as discussed in greater detail below.  *See generally*, Dkt. No. 13-1 at 9-10; *see also* Dkt. No. 12-1 at 66-72.

On December 18, 2012, Detective Okon contacted the Petitioner, who he identified as Quincy Lundy, about a shooting on Bissell Street, as the Detective believed Petitioner may have been an intended target.  Dkt. No. 13-1 at 958.  Detectives Okon and White conducted an interview of Petitioner, during which Petitioner stated he had been involved in an "ongoing dispute" with Jason Acevedo and Petitioner "had gotten into a fight with [Acevedo] and his friends on Butternut Street in August."  *Id*. at 959-60.  Petitioner told the detectives "his mother's house . . . [and] car had been shot up" and that he believed "Peso and Murk, [also known as] Jason Acevedo and Alfred Thomas" were responsible.  *Id*. at 960-61.

On January 13, 2014, Detectives Okon and White conducted another interview of Petitioner.  Dkt. No. 13-1 at 965-66.  Petitioner told Okon, "[t]hose mother fuckers from the

north side shot up my mother's house and car[,]" Okon asked Petitioner if he wished to press charges, and Petitioner responded "[m]e and my brother, we're not going to testify. We're not going to court. We won't go to court." Dkt. No. 13-2 at 3-4. Petitioner also told the detectives "he knew these guys from the north side, Peso in particular, hung out on Butternut Street and also hung out at a store, a corner store near Catherine Street[.]" *Id*. at 4.

Maurice Manuel identified Petitioner and co-defendant Dron as his cousins. Dkt. No. 13-1 at 670-71. Manuel testified he had spoken with Dron about another cousin, Alfred Thomas, who also went by the name of "Murk[.]" *Id*. at 674. Manuel recalled "Dron owed Murk money." *Id*. at 675. During a conversation which took place in October of 2012, Manuel explained "[Dron] asked me if I heard what happened on the north side . . . he said that somebody got killed on Catherine Street[,]" and when Manuel indicated he had heard "somebody talking about it[,]" Dron "said, [t]hat was me. I did that." *Id*. at 677-78. Manuel testified Dron said he had done so "[b]ecause he thought the person that he was beefing with[, an individual known to Manuel as Peso,] was out there." *Id*. at 678.

On May 9, 2014, Petitioner testified before the Onondaga County Grand Jury. Dkt. No. 13-1 at 694-95. Petitioner denied having any knowledge about Belle's death. *Id*. at 697. Petitioner was also asked the following questions, and gave the following answers:

> [Question]:    And you told the police that you thought it was
>                Jason Acevedo and Alfred Thomas that had
>                been shooting at your mother's?
> [Answer]:      I knew it was Jason and Alfred that was shooting
>                at my house but they never did anything.
> [Question]:    Were you upset by their shooting?
> [Answer]:      Anybody would be.
> ***
> [Question]:    Did they ever determine who shot your mother's
>                house and grandmother's house?
> [Answer]:      Yes. It was said on Facebook. He was shooting
>                up.

[Question]:    Who was?
[Answer]:    Alfred said on Facebook, his exact words: We're playing chess. It's your move. It's all on Facebook.

*Id*. at 697-98 (cleaned up).

Dr. Robert Stoppacher, the chief medical examiner at the Onondaga County Medical Examiner's Office, supervised Dr. James Terzian's performance of Walter Belle's autopsy. Dkt. No. 13-1 at 806-11. The autopsy revealed "a gunshot wound of entry . . . located in the left lateral chest . . . just below the armpit" and, internally, "evidence of injury to the left lung[.]" *Id*. at 813. Dr. Stoppacher explained emergency department staff at Upstate Hospital had begun "a thoracotomy procedure" to locate "the source of bleeding" and other internal injuries but Belle died during the procedure "because of blood loss" despite resuscitation efforts. *Id*. at 812-13. The medical examiners also recovered a bullet located "within the vertebral body[.]" *Id*. at 814. Dr. Stoppacher opined "Belle died as a result of injuries that he sustained to the chest resulting from a gunshot wound to the chest." *Id*. at 816. Dr. Stoppacher also concluded, with respect to the trajectory of the bullet, that "it traveled from the left to the right, and in doing so, it also went slightly upward, slightly towards the back of the body." *Id*.

Matthew Kurimsky, a firearms examiner at the Center for Forensic Sciences examined projectiles. Dkt. No. 13-1 at 762, 771. Kurimsky testified the projectile recovered during the autopsy of Belle was a "lead bullet[] consistent with [a] .22 caliber rim fire bullet[]." *Id*. at 771-74. Kurimsky was unable to determine whether the bullet recovered during the autopsy was fired from the same firearm as another projectile which was recovered during the investigation. *Id*. at 774-77.

Onondaga County Deputy Sheriff Mark Chapman testified he was assigned to transport Petitioner and co-defendant Dron from the justice center to the courtroom for trial. Dkt. No. 13-

2 at 138-40.  On Friday October 17, 2014, Chapman escorted the defendants to a holding cell

area following the medical examiner's testimony.  *Id*. at 140.  The Sheriff testified he overheard

some conversations between the defendants, explaining:

> I recall hearing Dron say, you know, that that was the best testimony
> yet. You know, that that looks good for us, meaning the medical
> examiner. And he was very, he was quite happy about it. And then
> he said because, he was talking to Quincy, because the medical
> examiner testified of the angle of the bullet that struck the victim
> came from an upward angle and, again, he was, you know, they
> expressed they were happy about that. And then Quincy, I overheard
> Quincy say that that looks good because we were up the hill shooting
> down.

*Id*. at 142.  Chapman agreed, on cross-examination, that he had not heard the defendants' entire

conversation.  *Id*. at 143.

Following the Sheriff's testimony, the People rested their case.  No. 13-2 at 156.  The

trial court denied both defendants' motions for a trial order of dismissal.  *See id*. at 157-66.  Co-

defendant Dron presented a case, calling four witnesses and testifying, in his own defense, that

he had been selling marijuana on the north side of Syracuse on the night of Belle's death and

heard gunshots.  *See generally*, *id*. at 166-342.  Petitioner did not present any witnesses or testify

at trial.  *See id*. at 142.

The parties delivered summations,[2] Onondaga County Court instructed the jury,[3] and the

jurors began deliberations.  A jury note indicated the jurors had reached a verdict with respect to

one defendant, but a unanimous decision could not be reached with respect to the other.  *See* Dkt.

No. 13-2 at 544.  The jury found co-defendant Dron Lundy guilty of Murder in the Second

---

[2] *See* Dkt. No. 13-2 at 364-91, Dron Lundy's summation, 391-416, Petitioner's summation, 417-64, the People's summation.
[3] *See* Dkt. No. 13-2 at 464-516.

Degree and both counts of Criminal Possession of a Weapon in the Second Degree.  *See id*. at 548-49.

County Court delivered an *Allen* charge and the jurors continued deliberations.  Dkt. No. 13-2 at 552-56.  The jury reached a verdict, finding Petitioner guilty of Murder in the Second Degree and two counts of Criminal Possession of a Weapon in the Second Degree.  *See id*. at 570-73.

### D.  Sentencing

Petitioner appeared before Onondaga County Court for sentencing on November 21, 2014.  *See* Dkt. No. 13-2 at 577-586.  County Court sentenced Petitioner to an indeterminate term of twenty-five years to life imprisonment for his conviction of Murder in the Second Degree.  *Id*. at 584-85.  For each of his Criminal Possession of a Weapon in the Second Degree convictions, Petitioner was sentenced to a determinate term of fifteen years' imprisonment and five years of post-release supervision, to run concurrently with the sentence imposed for the first count.  *Id*. at 585.

### E.  Motion to Vacate

Petitioner filed a Motion to Vacate his judgment of conviction pursuant to N.Y. CRIM. PRO. LAW ("C.P.L.") § 440.10(1)(h) and (g).  Dkt. No. 12-1 at 1-29, Petitioner's Pro Se Motion to Vacate and Exhibits.  Petitioner claimed trial counsel "was ineffective in failing to take measures to secure [Bloodworth's] appearance[;] . . . not moving for severance[; and] . . . fail[ing] to object to Detective Okon's hearsay testimony concerning Belle's alleged dying declaration."  *Id*. at 17-19.  Petitioner also asserted a freestanding actual innocence claim, supported by two affidavits submitted by Bloodworth.  *Id*. at 17-19.

In an affidavit dated June 17, 2016, Shevockie Bloodworth Jr. stated, to his knowledge,

there were:

> Numerous allegations of Quincy and Dron Lundy having problems
> and negative feelings/beef with numerous individuals who were also
> associates of the deceased Walter Belle, associates such as Peso,
> Merc, and Myself and others; However[,] I myself am aware of
> Quincy Lundy having beef with only Peso - Jason Acevedo and
> Merc and this has been ongoing beef/problems for quite a while . . .
> I would also state that I do not know who killed Walter Belle for the
> record, followed by me having absolutely no information that would
> assist or lead to the conviction of the incident. And also Peso was
> not at the scene of the shooting to conclude.

Dkt. No. 12-1 at 23.  In another affidavit dated November 9, 2016, Bloodworth further asserted:

> I wish to confirm that Quincy Lundy was not present on October 19,
> 2012, when Belle was shot, and neither was Jason Acevedo, also
> known as "Peso" . . . I've known Quincy for several years and
> certainly would have recognized him, or his brother Dron, if they
> were the shooters--however,  they were not the men I saw. The two
> males I saw that night were dark-skinned, and had hooded
> sweatshirts covering their heads. Moreover, both men were
> considerably smaller and appeared heavier than Dron and Quincy.
> As a separate matter, I would also note that Jason Acevedo was lying
> about being present during the shooting. He simply was not present
> when the shooting happened and fabricated his account to avoid a
> prison sentence on an unrelated matter.
> I also wish to confirm that Belle never told me who shot him, and
> that I never recognized him to be conscious at any time after he was
> shot.
> Notably, Quincy's defense attorney never contacted me, or asked
> me to testify in Quincy's defense.

*Id*. at 22 (cleaned up, emphasis omitted).

The People opposed Petitioner's Motion to Vacate, arguing Petitioner received

meaningful representation and Bloodworth's affidavits did not provide new evidence requiring

the judgment to be vacated.  *See* Dkt. No. 12-1 at 30-55, The People's Response Answering

Affirmation and Exhibits.  Petitioner submitted a reply with the assistance of counsel.  *See id*. at

56-72.  In his reply, in addition to arguing counsel was ineffective for failing to interview

Bloodworth, Petitioner's attorney:

> [R]espectfully ask[ed] that the Court take notice of a police report
> the undersigned recently received . . . According to the report, Sam
> Massard told authorities that, shortly before the shooting, he asked
> Belle for a light, and was walking away when he heard several
> gunshots. After briefly taking cover between two houses, Massard
> emerged and heard Belle yell out for help. Significantly, despite
> being nearby the gunfire, Massard never mentioned hearing a loud
> argument between Belle and three men. Because Acevedo insisted
> that a loud argument preceded the shooting, Massard's statement
> casts significant doubt on Acevedo's testimony, and would have
> gone far in strengthening the argument that [Acevedo] was not at the
> scene.

*See id*. at 61.

    Onondaga County Court denied Petitioner's Motion without a hearing.  *See* Dkt. No. 12-1

at 73-87, Amended Decision and Order.  County Court concluded neither of Bloodworth's

affidavits constituted newly discovered evidence, Petitioner's ineffective assistance claim could

be argued in a direct appeal, and found no basis to conclude Petitioner had made a prima facie

showing of actual innocence.  *See id*. at 75-86.

    Petitioner appealed County Court's denial of his Motion to Vacate to the Appellate

Division, Fourth Department.  Dkt. No. 12-5 at 16, Notice of Appeal.  The Appellate Division

granted Petitioner leave and consolidated the matter with Petitioner's direct appeal.  Dkt. No. 12-

6 at 24, Certificate Granting Leave to Appeal.

### F.  Consolidated Appeal

    Petitioner appealed his judgment of conviction and the denial of his post-judgment

motion to the Appellate Division, Fourth Department.  *See* Dkt. No. 12-1 at 88-172, Petitioner's

Brief to the Appellate Division; Dkt. No. 12-6 at 34-90, The People's Brief to the Appellate

Division; Dkt. No. 12-6 at 91-107, Petitioner's Reply.  As relevant here, Petitioner argued: (1)

the trial court erred in denying Petitioner's motion for severance (Dkt. No. 12-1 at 113-25); (2) Petitioner was denied the effective assistance of counsel, and County Court erred in denying Petitioner's C.P.L. 440 motion without a hearing (Dkt. No. 12-1 at 126-37); (3) comments made during the prosecutor's summation deprived Petitioner of a fair trial (Dkt. No. 12-1 at 138-48); (4) Bloodworth's affidavits constituted newly discovered evidence (Dkt. No. 12-1 at 149-54); and (5) the photo array shown to Hollister was unduly suggestive (Dkt. No. 12-1 at 165-70). The People refuted Petitioner's claims.  *See generally*, Dkt. No. 12-6 at 34-90.

On December 20, 2019, the Appellate Division affirmed Petitioner's judgment of conviction and Onondaga County Court's denial of Petitioner's Motion to Vacate.  *People v. Lundy*, 178 A.D.3d 1389, 1389-91 (4th Dept. 2019).[4]  As relevant here, the Fourth Department rejected Petitioner's argument that he received ineffective assistance because the prosecutor's arguments in summation did not constitute prosecutorial misconduct and Petitioner failed to demonstrate the absence of strategic or other legitimate explanations for counsel's other allegedly deficient conduct.  *Id*. at 1390-91.  The Appellate Division also found Petitioner failed to preserve his challenge to the suggestiveness of the photo array identification.  *Id*. at 1390. Finally, the Fourth Department rejected Petitioner's claim that County Court abused its discretion in denying his motion for severance.  *Id*. at 1389.

Petitioner applied for leave to appeal the Fourth Department's decision to the Court of Appeals.  Dkt. No. 12-6 at 112-29, Petitioner's Leave Application; *see also* Dkt. No. 12-6 at 130, The People's Opposition.  On May 7, 2020, the Court of Appeals denied Petitioner's leave application.  *People v. Lundy*, 35 N.Y.3d 994 (2020).[5]

---

[4] A copy of the Fourth Department's Memorandum is also included in the State Court Records.  *See* Dkt. No. 12-6 at 108-11.
[5] A copy of the Court of Appeals' Order is also included in the State Court Records.  *See* Dkt. No. 12-6 at 131.

## III.    PETITION

Petitioner challenges his 2014 judgment of conviction in Onondaga County, following jury trial, for one count of Murder in the Second Degree and two counts of Criminal Possession of a Weapon in the Second Degree.  *See generally*, Pet.; Dkt. No. 4.  Petitioner avers he is entitled to federal habeas relief because: (1) he was deprived of effective assistance of counsel, based on trial counsel's failure to (a) object to prejudicial testimony, (b) interview and call exculpatory witnesses, and (c) object to prosecutorial misconduct during the People's summation (*see* Pet. at 6-9; Dkt. No. 4 at 39-54); (2) the photograph array used to identify him was unduly suggestive and the trial court erred in failing to suppress a witness's in-court identification (*see* Pet. at 9); (3) the trial court erred in refusing to grant his motion for severance (*see* Pet. at 9; Dkt. No. 4 at 28-39); and (4) the trial court erred in denying his motion to vacate without a hearing (*see* Dkt. No. 4 at 45).

Respondent contends: (1) Petitioner's ineffective assistance claim is partially unexhausted but should be denied as the Appellate Division's rejection of Petitioner's arguments was neither contrary to, nor did it involve an unreasonable application of, clearly established federal law (*see* Dkt. No. 11-1 at  35-49); (2) Petitioner's challenge to the suggestiveness of the photo array identification is procedurally barred (*see* Dkt. No. 11-1 at 24-29); (3) Petitioner's severance claim is procedurally barred and, in any event, meritless (*see* Dkt. No. 11-1 at 30-35); and (4) the trial court's denial of Petitioner's post-judgment motion without a hearing was not properly presented to this Court and, in any event, provides no basis for habeas relief (*see* Dkt. No. 11-1 at 50).

## IV.    DISCUSSION

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas corpus relief with respect to a claim adjudicated on the merits in state court only if, based upon the record before the state court, the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011); *Premo v. Moore*, 562 U.S. 115, 120-21 (2011); *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  This standard is "highly deferential" and "demands that state-court decisions be given the benefit of the doubt."  *Felkner v. Jackson*, 562 U.S. 594, 598 (2011) (internal quotation marks and citation omitted).  "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

### A.  Ineffective Assistance of Counsel

Petitioner first argues he is entitled to federal habeas relief because he was deprived of the effective assistance of counsel based on trial counsel's failures to: (1) "interview and call two exculpatory witnesses . . . Shevockie Bloodworth and Sam Massard[;]" (2) "object to prejudicial testimony[;]" and (3) "object to the prosecutor's pervasive pattern of misconduct in summation[.]"  Pet. at 6-9 (cleaned up); *see also* Dkt. No. 4 at 39-54.

To succeed on a claim of ineffective assistance of counsel, a convicted defendant must prove both that: (1) "counsel's performance was deficient" and (2) counsel's "deficient

16

performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To

establish that counsel's performance was deficient, "a person challenging a conviction must

show that 'counsel's representation fell below an objective standard of reasonableness.'"

*Harrington v. Richter*, 562 U.S. 86, 104 (2010) (quoting *Strickland*, 466 U.S. at 688).  To

demonstrate counsel's deficient performance prejudiced his defense, "a defendant must 'show

that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different.'"  *Lafler v. Cooper*, 566 U.S. 156, 163 (2012) (quoting

*Strickland*, 466 U.S. at 694).

"Surmounting *Strickland*'s high bar is never an easy task."  *Padilla v. Kentucky*, 559 U.S.

356, 371 (2010).  "Establishing that a state court's application of *Strickland* was unreasonable

under § 2254(d) is all the more difficult."  *Harrington*, 562 U.S. at 105.  When evaluating an

ineffective assistance claim on habeas review, "the question is not whether a federal court

believes the state court's determination under the *Strickland* standard was incorrect[,] but

whether that determination was unreasonable—a substantially higher threshold."  *Knowles v.

Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro*, 550 U.S. at 473) (internal quotations

omitted).  Therefore, "[w]hen § 2254(d) applies, the question is not whether counsel's actions

were reasonable. The question is whether there is any reasonable argument that counsel satisfied

*Strickland*'s deferential standard."  *Harrington*, 562 U.S. at 105.

For the reasons explained below, Petitioner has not established the state court's

application of *Strickland* in denying his ineffective assistance claims was unreasonable.[6]

---

[6] Because Petitioner's assertion that he is entitled to habeas relief on the basis of ineffective assistance of counsel is
meritless, the undersigned need not consider Respondent's additional argument that Petitioner failed to properly
exhaust certain portions of his ineffective assistance claim in his request for leave to the Court of Appeals.

### 1.   Failure to Object to Detective Okon's Hearsay Testimony

Petitioner contends he was deprived of the effective assistance of counsel due to "counsel's failure to object to prejudicial testimony[.]"  Pet. at 8.  Petitioner avers "[c]ounsel inadvertently opened the door and then failed to seek an adequate remedy after eliciting double-hearsay testimony from Detective Ok[]on suggesting that the victim, after being shot, allegedly told Shevockie Bloodworth that petitioner's brother, Dron Lundy, was the gunman."  Pet. at 8.

In his cross-examination of Detective Okon, Petitioner's attorney inquired into the investigation of Belle's death.  *See* Dkt. No. 13-2 at 9.  Okon confirmed, in response to counsel's questioning, that at the time initial reports were made, the only two witnesses to provide information were Hollister and Laframboise.  *See id.*  Petitioner's attorney continued:

> [Counsel]:     And did you ever speak with a person by the
>                name of Shevacki Bloodworth?
> [Okon]:        I did.
> [Counsel]:     And he was a person that was actually at the
>                scene at the time of the shooting of Walter Belle,
>                correct?
> [Okon]:        That's correct.
> [Counsel]:     In fact, he himself received some sort of a
>                grazing injury?
> [Okon]:        Yes, sir.
> [Counsel]:     But he was unable to provide you with any
>                details with respect to the shooting?
> [Okon]:        He did.
> [Counsel]:     Did he tell you who did it?
> [Okon]:        Yes. He said a street name of Streets. He was
>                told by Walter Belle, the victim, before he died
>                that Streets did it.
> [Counsel]:     But he didn't say that he recognized the person
>                who did it?
> [Okon]:        That's correct.

*See id.* at 9-10.  On re-direct examination, the prosecutor asked Detective Okon "who is Streets?" and Okon answered "Dron Lundy."  *Id.* at 32.  On re-cross examination, Okon explained

Bloodworth made the statement about the identity of the shooter in an interview on October 21, 2012. *Id*. at 34. Counsel then asked:

> [Counsel]: Do you remember what Mr. Bloodworth said to you initially?
> [Okon]: That he couldn't identify who did the shooting.
> [Counsel]: Well, you just told us that the first time you spoke with him, he identified Streets. He said that Streets was the one?
> [Okon]: You asked for a name that was given to him, if he had heard. The victim while he was lying down on the ground advised Mr. Bloodworth to watch out for Streets. He did this.
> [Counsel]: Okay, So it's not that Mr. Bloodworth identified Streets, it's that Mr. Belle, the deceased, allegedly identified the shooter as a person with the name of Streets?
> [Okon]: Yes, sir.

*Id*. at 34-35. Finally, if Bloodworth ever identified Petitioner "as one [of] or the only shooter in this case?" and Okon answered "[n]o[.]" *Id*. at 35.

Petitioner has failed to prove counsel's performance in eliciting such testimony and refusal to request a remedial instruction constituted deficient performance. While Okon learned Belle told Bloodworth to "watch out for Streets"– that "Streets" was responsible –the nickname "Streets" referred to *Dron Lundy*, not Petitioner.

Significantly, Okon's testimony revealed Belle warned of only one shooter, inconsistent with the prosecution's theory that both Petitioner and co-defendant Dron fired gunshots at Belle. Further, the one individual Belle identified to Bloodworth *was not Petitioner*. It was not unreasonable for counsel to elicit testimony from which a jury could conclude the victim believed one individual, who was not Petitioner, was responsible for the incident. Belle's statement to Bloodworth both conflicted with Acevedo's identification of Petitioner as one of the individuals who fired gunshots at Belle and undermined additional evidence supporting the

People's theory that there were multiple shooters.  Nor was it unreasonable for Petitioner's attorney to elicit from Okon that Bloodworth, who was also hit by a gunshot, was unable to identify Petitioner or any other individual as the person who fired gunshots.

Even accepting, *arguendo*, Petitioner's argument that his attorney "indirectly implicated petitioner by association" by allowing Okon to testify Belle told Bloodworth co-defendant Dron was the shooter, counsel may have made a strategic decision not to draw the jury's attention to *potentially prejudicial testimony* by objecting or to *Petitioner's relationship with co-defendant Dron* by seeking an additional instruction from the trial court.  *See*, *e.g.*, *United States v. Corcoran*, 855 F.Supp. 1359, 1371 (E.D.N.Y. 1994) (trial counsel's "decision not to object to the testimony was a reasonable tactical decision" because objecting "would merely serve to highlight the testimony; *Nowicki v. Cunningham*, 2014 WL 5462475, at *25 (S.D.N.Y. Oct. 27, 2014) (explaining "[e]ven where an objection would have been sustained, an attorney is not required to raise an objection in order to render effective assistance" because "an attorney might have had a legitimate strategic or tactical reason for not raising an objection . . . [for example], an attorney might have elected not to object to a question because he did not want to draw attention to it" and collecting cases for the proposition that an attorney may validly choose not to object to a question to avoid drawing the jury's attention to it); *Gilmore v. Lewin*, 2007 WL 3274863, at *3 (N.D.N.Y. Nov. 5, 2007) ("[t]he decision whether to object, to avoid calling any additional attention to potentially damaging statements, is encompassed within the category of strategic legal decision-making[.]") (citations omitted).

In sum, Petitioner has failed to prove counsel's performance was deficient with respect to the cross-examination of Detective Okon.  Therefore, the Appellate Division's denial of

Petitioner's ineffective assistance claim with respect to counsel's cross-examination of Okon was not unreasonable.

### 2.  Failure to Interview and Call Exculpatory Witnesses

Petitioner next contends he was deprived of the effective assistance of counsel due to "counsel's failure to interview and call two exculpatory witnesses[.]"  Pet. at 6.  In disposing of Petitioner's ineffective assistance claims, the Appellate Division found Petitioner "failed to meet his burden of demonstrating the absence of strategic or other legitimate explanations for defense counsel's allegedly deficient conduct[.]"  *Lundy*, 178 A.D.3d at 1391 (internal quotations and citations omitted).

### i.  Sam Massard

Petitioner avers he was denied the effective assistance of counsel because trial counsel failed to call Sam Massard, whose statement to the police "undermined Acevedo's testimony" because "[c]ontrary to Jason Acevedo's testimony, Massard never heard Belle arguing with anyone before the gunfire rang out, and he did not mention seeing Acevedo at the scene."  Dkt. No. 4 at 45.  In the document Petitioner submitted to the state court in support of this claim, Detective Okon reported:

> On [October 23, 2012,] I spoke with Sam Massard again. Massard was previously interviewed by Det. White and I. Massard had just walked away from Belle and Bloodworth prior to them being shot. Once again Massard stated he was walking South on Catherine St. When Belle yelled out to him for a light. Massard then walked up [to] Belle and Bloodworth who were on the porch and gave them a light for a cigarette. Massard stated he knows Belle and Bloodworth from the neighborhood, and has talked with them before. Massard stated he was only about 10 yards away when he heard shots. Massard further relayed he immediately ran between two houses. Massard came running out when he heard Bloodworth yell out for help. Massard subsequently called 911. Massard stated he was positive no one was outside on the porch or in the immediate area

> when he talked with Belle and Bloodworth. Massard also believed
> the shots came from E. Laurel St. but did not see anyone.

Dkt. No. 12-1 at 67.

Contrary to Petitioner's contention, Massard's statements to the police were not

exculpatory. Massard stated he was walking south on Catherine Street, moving away from the

644 Catherine and the intersection with East Laurel Street, at the time he heard gunshots. Dkt.

No. 12-1 at 67; *see also* Dkt. No. 12-3 at 21. Therefore, Massard would not have been able to

provide information about the identities of the individuals firing gunshots from up the hill on

East Laurel Street, across the intersection from 644 Catherine. Moreover, while Massard "did

not mention seeing Acevedo[,]" Acevedo testified he walked towards 644 Catherine Street from

the other side, along East Laurel Street, after departing a store located on the corner of Lodi and

East Laurel Streets. Dkt. No. 13-2 at 42-44; *see also* Dkt. No. 12-3 at 21. At most, Massard's

statement that "no one was outside on the porch or in the immediate area when he talked with

Belle and Bloodworth" may have undermined Acevedo's testimony that Petitioner and co-

defendant Dron were "arguing" with Belle and Bloodworth before they walked up hill on East

Laurel Street and fired gunshots back down towards 644 Catherine. *See* Dkt. No. 13-2 at 44-45,

50-53.

As the Second Circuit has explained, "counsel's decision as to 'whether to call specific

witnesses-even ones that might offer exculpatory evidence-is ordinarily not viewed as a lapse in

professional representation.'" *United States v. Best*, 219 F.3d 192, 201 (2d Cir. 2000) (quoting

*United States v. Schmidt*, 105 F.3d 82, 90 (2d Cir. 1997); *see also United States v. Nersesian*,

824 F.2d 1294, 1321 (2d Cir. 1986) ("The decision whether to call any witnesses on behalf of the

defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by

defense attorneys in almost every trial."). Similarly, counsel's decisions regarding whether to

engage in cross-examination or impeachment of prosecution witnesses and if so, in what manner, are strategic in nature and entitled to deference. *Nersesian*, 824 F.2d at 1321 ("Decisions whether to engage in cross-examination, and if so to what extent and in what manner, are similarly strategic in nature."); *see also*, *e.g.*, *DeFayette v. Superintendent*, 2008 WL 755822, at *17 (N.D.N.Y. Mar. 19, 2008) (concluding the petitioner had "failed to demonstrate that counsel's decision not to call certain witnesses . . . was objectively unreasonable in contravention of *Strickland*" because "trial counsel's decisions regarding whether to call or impeach witnesses and to elicit certain testimony were reasonable strategic judgments.") (citations omitted); *Browne v. Heath*, 2014 WL 8390320, at *25 (E.D.N.Y. Aug. 25, 2014) (rejecting the petitioner's claim that counsel was ineffective for failing to impeach a witness' testimony, explaining "the manner and extent to which an attorney chooses to cross-examine a witness is a strategic decision[.]") (citations omitted), *report and recommendation adopted*, 2015 WL 1469182 (E.D.N.Y. Mar. 30, 2015).

Here, counsel's decision to impeach Acevedo's testimony by means other than eliciting testimony from Massard was a reasonable strategic decision. In his cross-examination of Acevedo, counsel highlighted Acevedo's: prior inconsistent statements about his familiarity with Walter Belle, 644 Catherine Street, and "the people that hung out over there" (Dkt. No. 13-2 at 101-02); previous altercation with Petitioner (Dkt. No. 13-2 at 111-12); criminal history (Dkt. No. 13-2 at 119); *see also* Dkt. No. 13-2 at 102 (defense counsel asked Acevedo "[y]ou're a liar, right?" and the witness answered "[y]es."). Acevedo also agreed, in response to co-defendant Dron's attorney's questioning, that he had not cooperated with law enforcement in the investigation of Belle's death until he sought a plea deal for his own then-pending criminal case. *See id*. at 81-84. The decision to undermine Acevedo's testimony in this manner was not

unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 8 (2003) ("When counsel focuses on some issues to the exclusion of others, there is a strong presumption that he did so for tactical reasons rather than through sheer neglect.").

In any event, Petitioner has failed to demonstrate that, but for the absence of Massard's testimony, the result of his trial would have been different; therefore, Petitioner cannot prevail on his ineffective assistance claim with respect to Massard. *Muller v. Lee*, 2016 WL 5401090, at *25 (N.D.N.Y. Sept. 5, 2016) (rejecting Petitioner's claim of ineffective assistance based on counsel's failure to call two individuals to testify, explaining "[w]hile these potential witnesses might have supported Petitioner's defense in some part, Petitioner cannot demonstrate that but for the absence of their testimony, the result of the trial would have been different."), *report and recommendation adopted*, 2016 WL 5394742 (N.D.N.Y. Sept. 27, 2016); *see also*, *e.g.*, *Swan v. Martuscello*, 2018 WL 6179428, at *6 (N.D.N.Y. Nov. 27, 2018) (denying petitioner's claim that counsel was ineffective for failing to present testimony from three witnesses and other evidence explaining "the evidence [the petitioner] identifies [wa]s not exculpatory and largely irrelevant" therefore, the Petitioner "fail[ed] to establish any reasonable probability of a different result had the evidence been introduced."); *Russo v. United States*, 2007 WL 2455140, at *6 (E.D.N.Y. Aug. 23, 2007) (explaining "[t]he decision to call or not call a witness is a strategic choice of counsel 'which courts will practically never second-guess'" and, "[e]ven if counsel's failure to call [a potential witness] was an error, there is no reason to believe the result would have been different if he had called her; therefore, th[e defendant's] claim [of ineffective assistance] fails the *Strickland* test.").

ii.    **Shevockie Bloodworth**

Petitioner also avers counsel was ineffective for failing to failing to interview and call

Shevockie Bloodworth, arguing "[h]ad counsel taken the minimal step of contacting Bloodworth,

he would have learned that Bloodworth was absolutely certain that petitioner Lundy was not[

]one of the shooters."  Dkt. No. 4 at 43 (emphasis omitted).

In a police report, Detective Okon documented an interview of Bloodworth which

occurred at the C.I.D.  Dkt. No. 12-1 at 72.  Okon reported:

> Bloodworth stated he had met Belle about 2 months ago and they
> had become fairly close. Bloodworth stated during one of his
> conversations with Belle he had admitted to having some gang
> affiliation and that he had other means of supplementing his income.
> Belle had also told Bloodworth that he was [with] some of his
> friends on Butternut St. about a month ago when a guy[] he knows
> as "Street" (Dron Lundy) ['s] little brother got beat up. Bloodworth
> stated he assumed it was "gang or drug related". Belle was adamant
> that Bloodworth did not share a lot of information with him about
> his other activities (gang or drugs) but did mention to watch out for
> "Streets". Bloodworth also mentioned that he was walking with
> Belle about a month ago on Butternut St. near Park St. when they
> were shot at. Bloodworth stated he didn't see anyone but believed
> the person(s) who shot at them were located in the vacant lot across
> from Kentucky Fried Chicken and by a large green electrical box.
> At this time, Belle mentioned "Street" as a potential suspect to
> Bloodworth. During this interview Bloodworth was asked if he
> could remember any other thing regarding the shooting. *Bloodworth*
> *stated after Belle and himself were shot on the porch he went to Belle*
> *to try and help him. Bloodworth then relayed Belle stated "I know*
> *who shot us, it was Streets[,] watch out for him". Once again*
> *Bloodworth stated he could not identify the person(s) who shot Belle*
> *and himself.* Bloodworth did state he was positive the person(s) who
> shot them "were coming down Laurel hill towards Catherine St.["]
> Bloodworth stated he saw flashes come from this direction as he was
> being shot. The 500 block of Laurel St. is on a steep incline and west
> of Catherine St. 644 Catherine St. is the last house on the block and
> is just before E. Laurel St. At this time Bloodworth maintained his
> account he had given to Det. Hargraves when interviewed. Once
> again Bloodworth felt the weapon used to shoot Belle and himself
> was a .22 cal d[ue] to the sound. *Bloodworth also felt this incident*
> *was related to the Butternut St. fight a month ago. Bloodworth also*

25

> *relayed he has never met or believes he has seen "Street" and does*
> *not know his real name.*

Dkt. No. 12-1 at 72 (emphasis added).  Detective Okon subsequently reported:

> On [October 23, 2012,] I interviewed Bloodworth again regarding
> this incident. Bloodworth was previously interviewed by Det.
> Hargraves ([October] 19) and again by Det. White and I on October
> 21st. Once again Bloodworth maintained his account of this incident
> and that *he did not know who shot Belle or himself.*

Dkt. No. 12-1 at 67 (emphasis added).  Petitioner is unable to demonstrate his attorney's

performance was deficient based on trial counsel's failure to interview and call Bloodworth.

First, when there is "reason to believe that pursuing certain investigations would be

fruitless or even harmful, counsel's failure to pursue those investigations may not later be

challenged as unreasonable." *Strickland*, 466 U.S. at 691.  Police records indicate Bloodworth

consistently maintained he was not able to identify the individual(s) who shot him and Belle.

Therefore, there was no reason for counsel to believe Bloodworth could provide information

about the identity of the shooter which would have been beneficial to Petitioner's case.

Accordingly, even accepting Bloodworth's affidavit statements that "[Petitioner]'s attorney

never contact [him]"– Dkt. No. 12-1 at 22 –counsel's decision did not constitute deficient

performance.

Next, as explained above, determining whether to call a witness to testify is "tactical

decision" and Bloodworth's statements contained information which would have been damaging

to Petitioner's defense. *See Nersesian*, 824 F.2d at 1321.  Bloodworth told police he believed the

shooting "was related to the Butternut St. fight" during which Belle and some friends "beat up"

Street's little brother, the Petitioner. *See* Dkt. No. 12-1 at 72.  Counsel's refusal to call a witness

who would have bolstered the People's case against Petitioner was not an unreasonable decision.

26

Moreover, Petitioner is unable to establish he was prejudiced with respect to counsel's failures to interview and call Bloodworth. Had Bloodworth testified– consistent with his November 2016 affidavit –that he had "known [Petitioner] for several years and certainly would have recognized him, or his brother Dron, if they were the shooters -- however, they were not" and that "Belle never told [Bloodworth] who shot him," such testimony would have directly contradicted Bloodworth's October 2012 statements "that he did not know who shot Belle or himself." Dkt. No. 12-1 at 67, 22. Therefore, as Onondaga County Court acknowledged in denying Petitioner's motion to vacate, Bloodworth's affidavit statements were "untrustworthy and inherently unreliable" and, as a result, Petitioner cannot show a "reasonable probability" that, but for counsel's failure to call Bloodworth to testify, "the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see also*, *e.g.*, *Hasarafally v. United States*, 2012 WL 6107685, at *8 (S.D.N.Y. Dec. 10, 2012) (explaining "counsel's failure to call [an individual] as a witness did not prejudice [the petitioner]" because the potential witness's "testimony would likely have been more damaging than helpful").

Accordingly, the Appellate Division's denial of Petitioner's ineffective assistance claims with respect to counsel's failure to call Massard and Bloodworth to testify was not unreasonable.

### 3. Failure to Object to Prosecutorial Misconduct

Finally, Petitioner contends trial counsel was ineffective because he failed to object to various remarks during the People's summation which Petitioner contends constituted prosecutorial misconduct. *See* Pet. at 8. Petitioner's attorney objected to one of the prosecutor's comments during the People's summation but the trial court overruled the defense objection. Dkt. No. 13-2 at 427.[7] In his consolidated appeal, the Appellate Division rejected Petitioner's

---

[7] In his consolidated appeal, Petitioner argued the prosecutor– (1) "repeatedly vouched for the credibility" of "prosecution witnesses[;]" (2) "denigrated the defense[;]" (3) "undermined the presumption of innocence[;]" and (4)

argument "that he was deprived of a fair trial based on prosecutorial misconduct during

summation" as Petitioner's claim was "largely unpreserved and, in any event, lacks merit."

*Lundy*, 178 A.D.3d at 1389-90 (citation omitted).  The Fourth Department further explained:

> The prosecutor's closing statement must be evaluated in light of the
> defense summation, which put into issue the [witnesses'] character
> and credibility and justified the People's response . . . [and, e]ven
> assuming, arguendo, that any of the prosecutor's comments during
> summation exceeded the bounds of propriety . . . they were not so
> pervasive or egregious as to deprive defendant of a fair trial[.]

*Id*. at 1390 (internal quotations and citations omitted).

Petitioner contends "the cumulative effect of the prosecutor's remarks deprived petitioner

of a fair trial," arguing various portions of the People's summation violated both violated state

law and rendered his trial fundamentally unfair such that the "remarks would warrant habeas

relief outside the context of an ineffectiveness challenge."  *See* Dkt. No. 4 at 47-48, 52.  "[A]

prosecutor's improper comments will be held to violate the Constitution only if they 'so infected

the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Parker v.

Matthews*, 567 U.S. 37, 45 (2012) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986))

(additional quotations and citations omitted).  When making this determination, the allegedly

improper comments must be "viewed in context"– *Jackson v. Conway*, 763 F.3d 115, 146 (2d

Cir. 2014) –therefore, "[t]he prosecutors' comments must be evaluated in light of the defense

argument that preceded it[.]"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986).

For the reasons explained below, the prosecutor's summation remarks did not so infect

Petitioner's trial with unfairness as to violate his due process rights.  Therefore, trial counsel's

failure to object to the remarks Petitioner now contests did not deprive him of the effective

---

"misstated the evidence" –citing, *inter alia*, *People v. Bailey*, 58 N.Y.2d 272, 277 (1983); *People v. Porter*, 136
A.D.3d 1344, 1347 (4th Dept. 2016); *People v. Slishevsky*, 97 A.D.3d 1148, 1150 (4th Dept. 2012); *People v.
Benedetto*, 294 A.D.2d 958, 959 (4th Dept. 2002).  *See* Dkt. No. 12-1 at 139-47.

assistance of counsel and the Appellate Division's denial of his ineffective assistance claim on

this basis was not unreasonable.[8]  *See, e.g., Baptiste v. Ercole*, 766 F. Supp. 2d 339, 362

(N.D.N.Y. 2011) (citation omitted) ("[t]he failure to make meritless arguments or objections

cannot constitute ineffective assistance.").  Additionally, with respect to the portion of

Petitioner's prosecutorial misconduct claim that was properly preserved by trial counsel's

objection, federal habeas relief is not warranted.

Petitioner first argues the prosecutor improperly "vouched for the credibility of the

People's witnesses . . . Jason Acevedo, . . . Tamekia Hollister, . . . [and] Maurice Manuel[.]"

Dkt. No. 4 at 48.  In his closing argument, Petitioner's attorney accused Hollister of fabricating a

portion of her testimony, specifically the portion about seeing Petitioner and co-defendant Dron

traveling back up East Laurel Street after hearing gunshots.  *See* Dkt. No. 13-2 at 400-01.[9]

Petitioner's attorney similarly averred Acevedo was not credible and submitted to the jury that

Acevedo was never at the scene of the murder and lied to "get back at" Petitioner.  *See* Dkt. No.

---

[8] To the extent Petitioner avers the prosecutor's remarks were improper under state law, even if they did not rise to
the level of a due process violation– *see* Dkt. No. 4 at 52-53 (arguing the prosecutor's comments "at a minimum
rose to [the] level of violating state law" and "it is certainly probable that had counsel objected, petitioner would
have been entitled to reversal as a matter of state law") –and his conviction would have been reversed on direct
appeal based on the state courts' holdings in *People v. Bailey*, *People v. Porter*, *People v. Slishevsky*, and *People v.
Benedetto*, any such argument is unpersuasive.  As Respondent points out, Petitioner argued the People's summation
remarks constituted misconduct citing the same four cases in his brief to the Appellate Division and the Fourth
Department disagreed with Petitioner's arguments.  *See Lundy*, 178 A.D.3d at 1389-90.

[9] Petitioner's attorney argued:

> [A]ccording to Ms. Hollister, the two subjects walked down the street, shot Walter
> Belle, stood there and waited for the police to come and only when the police
> arrived do they decide that it was time to make an exit and they turn around and
> run away . . . on October 19, 2012, when she talked to officer Rick Raymond, she
> didn't tell him that she saw anybody after the shooting. On October 20, 2012,
> when she talked to detective Rory Gilhooley, she didn't tell him that she saw
> anybody running away from the shooting. On October 21, 2012, when she talked
> with detective Jeff Okon, she didn't tell him that she saw anyone running away
> from the shooting . . . on March 19 of 2014 when she talked to the grand jury, she
> was asked the specific question ["]did you see the shooters, the subjects after the
> shooting?["] One word answer: ["]No.["] It's only after March of 2014, a year
> and a half after Walter Belle was killed, that Tamekia Hollister for the first time
> indicates that she saw the subjects after the shooting.

Dkt. No. 13-2 at 400-01.

13-2 at 402-16.[10]  Additionally, co-defendant Dron's counsel referred to Maurice Manuel as "convicted inmate Manuel[,]" emphasized Manuel's statement to the police was "unbelievable[,]" and urged the jury to consider, in assessing Manuel's credibility, that Manuel matched Laframboise's description of one of the individuals she observed walking on East Laurel Street prior to the sound of gunshots.  *See* Dkt. No. 13-2 at 366, 376-78.[11]

During the People's closing argument, the prosecutor submitted to the jury that the people's witnesses "[we]re credible and that their testimony [wa]s corroborated by the testimony of . . . other witnesses in the case."  Dkt. No. 13-2 at 419.  The prosecutor also specifically argued, *inter alia*, "Jason Acevedo . . . is credible and his testimony is worthy of belief" – *id*. at 425 – "Tamekia Hollister's testimony is credible. It's worthy of your belief. And it makes sense in light of the other evidence in the case" – *id*. at 445 – and asked "[w]hat motivation would [Maurice Manuel] have to make this up? None. I submit to you that Maurice Manuel was here for one reason and that was to do the right thing."  *Id*. at 458.

When viewed in light of defense counsels' arguments about the veracity of the testimony the People had presented, the prosecutor's remarks did not improperly vouch for the credibility of state's witnesses, rather, the comments fairly responded to the defense summations.  *See Jones v. Annucci*, 124 F. Supp. 3d 103, 126 (N.D.N.Y. 2015) (the prosecutor's statements that a CI

---

[10] Petitioner's attorney stated:

> [Acevedo] said that he was there and he saw it happen. But, members of the jury, I submit to you that Jason Acevedo wasn't there. He freely admitted on the stand, freely admitted that he is, in fact, a liar. He admitted that he lied to the police. He lied about other things that happened. He doesn't talk to the police because he's a criminal . . . He wanted to get back at [Petitioner] because he got beat up and he wanted to save himself up to 24 years in prison.

Dkt. No. 13-2 at 402-03.  Counsel later continued "[t]here's absolutely zero evidence to corroborate Acevedo's story that he was present at the location when Walter Belle was shot . . . And you cannot trust Jason Acevedo saw the person that shot Walter Belle because he wasn't there." *Id*. at 408.  Finally, Petitioner's attorney declared "Acevedo didn't report what he saw on October 19, 2012, . . . He waited 13 or 14 months before he finally came forward with this information. Only after he needed help . . . His testimony is tainted." *Id*. at 415-16.

[11] Co-defendant Dron Lundy's attorney also made arguments about the credibility of Hollister and Acevedo's testimony. *See generally*, Dkt. No. 13-2 at 364-91.

"was 'credible' and had 'testified truthfully' . . . were properly made in response to the defense's attack on the witness's credibility."); *United States v. Carr*, 424 F.3d 213, 227 (2d Cir. 2005) ("the government is allowed to respond to an argument that impugns . . . the integrity of its case") (quoting *United States v. Thai*, 29 F.3d 785, 807 (2d Cir. 1994) (internal quotations and additional citations omitted). Therefore, defense counsel's refusal to object to the prosecutor's remarks did not constitute ineffective assistance.

Petitioner next asserts the prosecutor "denigrated the defense[.]" Dkt. No. 4 at 49. Petitioner asserts it was improper to: argue the defense attorneys "beat up on and confus[ed]" Tamekia Hollister with "incorrect dates . . . [and] information[;]" characterize a defense argument as "absurd" and an "attempt[] to distract" the jury; and suggest co-defendant Dron's testimony was "coached[.]" *Id*.

During his cross-examination of Hollister, co-defendant Dron's attorney asked the witness multiple questions about her grand jury testimony, which resulted in the trial court asking the witness if she understood the question, the witness answering that she did not, and the court instructing counsel to rephrase the question. *See* Dkt. No. 13-1 at 434-35. The prosecutor later objected to the phrasing of subsequent questions and counsel was directed to read the full questions and answers. *See id*. at 436-37. Counsel also asked the witness about her statements to police about the appearance of the individuals she observed, asking:

> But didn't you give an identification to somebody, to officer Bochene or Gilhooley on the night in question? Wasn't it October 19? Maybe the 20th. The 21st. I apologize, it was the 21st. And sometime after that you had a discussion with detective Okon. Do you remember that discussion? The individual that came to you the next, it may have been sometime in December. And you were going to do a photo identification, do you remember that?

*Id*. at 439.  In a subsequent cross-examination, Petitioner's attorney also asked Hollister several questions about her testimony on direct, verbal statements to police on October 21, 2012, written statement to police on October 21, 2012, and grand jury testimony from March 19, 2014, about what she observed on October 19, 2012.  *See id*. at 441-67.

Petitioner's attorney asked a questions about which of the individuals the was wearing the "camouflage hoodie" remaking the witness had "kind of gone back and forth in [her] testimony" that day and Hollister testified she was "getting really frustrated."  Dkt. No. 13-1 at 447.  Hollister requested to review her grand jury testimony, counsel asked if she could not recall which individual was wearing the "camouflage hoodie[,]" and the witness responded "[a]t this point in time, I don't know who it is that had it on. Now if it was in the -- because it's been so long ago…"  *Id*.  Counsel asked "Ms. Hollister, you testified to that this morning, haven't you? Didn't [the prosecutor] ask you questions about who was wearing what? You said, yes, he had the camouflage hoodie on. Do you remember that? And now you need your memory refreshed because I'm asking the questions?"  *Id*. at 447-48.  The witness answered "[n]o, because you're pissing me off and I can't think when I'm pissed off."  *Id*. at 448.

As discussed above, both defense attorneys made various comments about Hollister's credibility in their respective summations.  In the People's summation, the prosecutor argued Hollister:

> [C]ame to this courtroom as a completely uninterested witness and she was beat up on the witness stand . . . she's got a ninth grade education . . . [and] a medical disability. And two lawyers with years and years of experience cross-examined her, confusing her with dates and names of police officers that she met two years ago. When she testified on direct, she knew what she was talking about. She was allowed to testify. She was allowed to tell you what she saw. But on cross-examination she was fed information, fed dates, incorrect dates, incorrect information. She was confused and she just agreed with the attorneys. They treated her as if she had a reason to

> want to see these two defendants convicted. But she has no reason.
> They accused her of making up information and not telling the
> police information. She told you she did provide police all the
> information she testified to.

Dkt. No. 13-2 at 442-43.

In co-defendant Dron's summation, defense counsel argued "Maurice Manuel" was

"approximately five foot four inches tall, certainly the height of a 13-year-old" and "Ms.

Laframboise . . . identified one of those individuals walking by her home as being about 13 years

of age." Dkt. No. 13-2 at 376-78. Counsel also stated co-defendant Dron testified Manuel was

one of the individuals who "g[o]t a ride to the north side" the night of Belle's death. *Id*. at 379.

During the People's summation, the prosecutor declared:

> The defense would have you believe that it wasn't Dron Lundy. It
> was Maurice [Manuel] that fired that .22 caliber handgun; that he
> was at the scene because he was in a vehicle with Dron Lundy . . .
> And according to the defense, he quickly pled guilty to [a weapons]
> charge so he wouldn't get charged with murder. But that's absurd.

*Id*. at 426-27. Petitioner's attorney objected and the trial court overruled the objection, reasoning

the prosecutor's statement was a "[f]air comment." *Id*. at 427. The prosecutor continued,

arguing "[t]here's absolutely no evidence that Maurice Manuel had anything to do with the death

of Walter Belle . . . The suggestion that Maurice [Manuel] is the shooter is an attempt to distract

you. It's not a reasonable doubt." *Id*. at 427.

Co-defendant Dron's counsel also argued, with respect to his client's credibility: "I

would like you to remember not only what he said but how he testified. I certainly believe he

was truthful . . . he answered the questions in a straightforward fashion. He was direct. I thought

he was calm. He was polite. He was consistent." Dkt. No. 13-2 at 390. During the People's

summation, the prosecutor also discussed witness credibility, instructing the jury to "[u]se [their]

common sense. Defense counsel says Dron Lundy was calm. He was polite. He was direct. He

was coached." *Id*. at 440-41.  The prosecutor next argued co-defendant Dron "committed perjury in the grand jury[.]" *Id*. at 441-42.

When viewed in context, the prosecutor's statement that Hollister was "beat up" and "confused" by the two defense attorney's cross-examinations and suggestion that her testimony on direct examination was credible despite Hollister's confusion with her multiple prior statements made throughout two years between the incident and trial was within the bounds of permissible advocacy.  *See generally*, *Lalonde v. Thomas*, 2022 WL 1303918, at *16 (N.D.N.Y. May 2, 2022) (denying the petitioner's prosecutorial misconduct claim because the prosecutor's comments in summation that it "was not easy for" a witness to testify and the witness was credible because "he got nothing in exchange for his testimony" were fair arguments); *Lane v. Graham*, 2016 WL 154111, at *12 (N.D.N.Y. Jan. 12, 2016) (the prosecutor's "denigrating comments may be viewed as proper inferences from the evidence presented at trial and constituted a fair response to defense counsel's summation, in which he challenged the veracity of the prosecution's witnesses and the strength of its case.").  Next, the prosecutor's characterization of the defense's theory that Manuel caused Belle's death as "absurd" and an "attempt to distract" the jury did not amount to prosecutorial misconduct.  *See Portes v. Capra*, 420 F. Supp. 3d 49, 58 (E.D.N.Y. 2018) ("The prosecution's characterization of the defense theory of self-defense as 'absurd' . . . was not improper such that it could be said to constitute prosecutorial misconduct.") (citing *United States v. Rivera*, 971 F.2d 876, 884 (2d Cir. 1992)); *United States v. Millar*, 79 F.3d 338, 343-44 (2d Cir. 1996) (concluding "remarks that [the defendant]'s defense was 'hog wash' and that defense counsel had created a 'smoke screen'" did not rise to the level of prosecutorial misconduct) (citation omitted).  The prosecutor's suggestion that co-defendant Dron's trial testimony was "coached" similarly did not attack the defense in a

manner which violated Petitioner's due process rights.  *See Baum v. Leonardo*, 1989 WL 85786,

at \*7-8 (S.D.N.Y. July 25, 1989) (rejecting the petitioner's claim that the prosecutor improperly

"'attacked the integrity of counsel' when he implied that the defense attorney had concocted the

defense story and coached [a witness] in how to recount it" explaining "the prosecutor's remarks

during summation did not rise to the level of a violation of petitioner's due process rights"

because the challenged statements "involved attempts by the prosecutor to discredit the defense

testimony and to bolster the people's testimony . . . [and] were directly responsive to statements

that defense counsel made in summation in which he sought to establish the contrary[.]")

(citations omitted).  Accordingly, defense counsel's failure to object to the prosecutor's remarks

did not deprive him of the effective assistance of counsel.

Petitioner also argues "the prosecutor undermined the presumption of innocence[.]"  Dkt.

No. 4 at 49.  In his summation, co-defendant Dron's attorney discussed Chapman's testimony

about Petitioner and his co-defendant's statements which were "overheard by transport in the

holding cell" arguing,

> [I]n the statement they admitted that they were involved in this
> murder. We had an opportunity to cross-examine them and you
> heard the officer say, well, I didn't hear the entire conversation . . .
> [But] then look at what happens if you just add two words, two
> simple words, and that would be "they say." Because all of [the]
> sudden "we were on the top of the hill shooting" changes
> dramatically when it becomes, "they say we were on the top of the
> hill shooting down." Don't forget that he didn't hear the entire
> conversation.

Dkt. No. 13-2 at 388-39.  Petitioner's attorney also discussed Chapman's testimony in

summation, arguing:

> [Chapman's] testimony was offered to prove that in the back room
> in the holding cell that [Petitioner] and Dron Lundy engaged in a
> conversation which had a tendency to incriminate themselves.
> However, you heard that deputy Chapman didn't hear the whole

conversation. Most importantly, he didn't hear the beginning of the conversation . . . We have a quote and, by the way, not even a quote but snippets of what was said over the course of a minute or two taken out of context from a person who wasn't there to hear the entire conversation. And that's offered as evidence to prove that either [Petitioner] or Dron Lundy were involved in this . . . And I submit to you without knowing more about what was said by this taking things out of contest, you don't know what was said in the holding cell area of this courtroom. And the evidence that they've offered is insufficient to support any allegation that [Petitioner] incriminated himself. I mean, after all, what they were talking about apparently according to deputy Chapman was that they believed was testimony from a medical examiner that exonerated them. That said this whole case theory is nonsense. Because the medical examiner said that bullet that killed Walter Belle was traveling at an upward angle, not downhill, but an upward angle. So, you know, it's not, you know, beyond imagination that they would be happy about that. Of course they're happy. They're charged with murder. Finally, what we're looking for, something that can send us home.

*Id.* at 409-11.

In discussing the trajectory of the bullet which struck Belle on summation, the prosecutor

declared:

The bullet didn't change direction as the defense would suggest . . . Walter Belle is the one whose body changed position. And there's no evidence of anybody else shooting from any other direction other than the two defendants standing on that hill. The defendants thought the testimony was good for them. In their mind how could a bullet be traveling upward if they're firing down a hill. [Defense counsel] asked deputy Chapman when he testified, Did you ever hear the defendants proclaiming their innocence? What did he say? No. What he heard them talk about were the flaws that they thought existed in the case. Because they know, as do you, that the People have the burden . . . They don't have to prove their innocence. That's what they're counting on, that the People won't prove their case. So when they talked about Dr. Stoppacher's testimony, they were happy. Because to them, it was a flaw in the case. It was testimony that was good for them. According to Dron, it was good because the medical examiner said the angle of the bullet was upward. And Quincy agreed, Yeah, it's good for us because we were firing down the hill. Not: The evidence has us firing down the hill. I mean, yeah, deputy Chapman said he didn't hear the whole conversation but he heard Dron and he heard Quincy's response. He didn't say, The

> evidence has us firing down the hill. He said, Yeah, that's good
> because we were firing down the hill.

Dkt. No. 13-2 at 461-62. Petitioner contends "these remarks enticed jurors to infer

consciousness of guilt from petitioner's reliance on the presumption of innocence" and "grossly

misrepresented Deputy Chapman's testimony . . . Deputy Chapman did testify that he overheard

petitioner discussing his innocence with his brother, Dron[.]" Dkt. No. 4 at 50.

When viewed in context, the prosecutor's remarks neither misrepresented Chapman's

testimony nor undermined the presumption of innocence. In his cross-examination of Chapman,

co-defendant Dron's attorney inquired:

> [Counsel]:    During the week and a half that we've been in
>               trial, did you ever hear the two defendants
>               discus their innocence in the holding cell?
> [Chapman]:    Not in the holding cell.
> [Counsel]:    Have you heard it in another spot?
> [Chapman]:    Yes.
> [Counsel]:    Okay. So at times they have spoken of why they
>               shouldn't be here as defendants in this murder
>               trial, correct?
> [Chapman]:    No, no.
> [Counsel]:    You said they discussed their innocence. I
>               presume that that means they didn't discuss
>               their guilt, they discussed why they shouldn't be
>               here?
> [Chapman]:    No.
> [Counsel]:    How do you define then they discussed their
>               innocence?
> [Chapman]:    *I've heard them discuss I guess more or less for
>               lack of a better term maybe flaws in some of the
>               witnesses and/or the prosecution in the case.
>               Not necessarily their innocence.*
> [Counsel]:    *Well, you heard them certainly discuss their
>               innocence on the day in question, correct?*
> [Chapman]:    *No.*

Dkt. No. 13-2 at 144 (emphasis added). Therefore, the prosecutor's argument that Chapman

stated he heard the defendants "talk[ing] about . . . the flaws that they thought existed in the

[People's] case" not "proclaiming their innocence" was not a misrepresentation of Chapman's testimony. Furthermore, the prosecutor's remarks did not lead the jurors to "infer" Petitioner's guilt from his "reliance on the presumption of innocence" but rather from Chapman's testimony that he "overheard [Petitioner] say that that looks good because *we were up the hill shooting down*[.]" Dkt. No. 13-2 at 142 (emphasis added).

Viewed in context, the prosecutor's argument that Petitioner's "we were up the hill shooting" statement supported the People's theory did not undermine the presumption of innocence. Therefore, trial counsel's failure to object to this portion of the prosecutor's summation did not constitute ineffective assistance.

Petitioner similarly argues the prosecutor's statement that a guilty verdict was consistent with justice "backdoored the rather absurd notion that an acquittal would have been inconsistent with justice, and that jurors were morally obligated to render a guilty verdict." Dkt. No. 4 at 50-51. The prosecutor concluded the People's summation by declaring:

> If you find that the People have proven each defendant's guilt beyond a reasonable doubt, then it's your duty to come back into this courtroom and to tell the defendants that they are, in fact, guilty. To hold them accountable for what they have done. *A guilty verdict in this case is justified by the evidence.* So at this time, ladies and gentlemen, in the name of the People of the State of New York, *I'm asking you to return the only verdict that you will find consistent with the evidence. The only verdict that will be consistent with justice. And that's a verdict on all counts of guilty.*

Dkt. No. 13-2 at 463. Petitioner's suggestion that a prosecutor commits misconduct by arguing a finding of guilty is "consistent with the evidence" and "consistent with justice" is meritless. *See*, *e.g.*, *Williamson v. Burge*, 2005 WL 6933383, at *20 (N.D.N.Y. June 28, 2005) (counsel's failure to argue the ADA "wrongfully stated that a guilty verdict would be 'justice that acknowledges the family's victimization'" was not "objectively unreasonable . . . To the

contrary, the [petitioner's] theories . . . are without substance."); *Mitchell v. New York*, 2011 WL 5239213, at *2 (E.D.N.Y. Nov. 1, 2011) (the state court's denial of the petitioner's prosecutorial misconduct claim, where the prosecution "ask[ed] the jury to 'return the only verdict you know speaks justice in this case. And that verdict is guilty.' . . . was not contrary to or an unreasonable application of federal law.").  Accordingly, defense counsel's failure to object to the remark did not deprived Petitioner of the effective assistance of counsel.

Finally, Petitioner asserts the prosecutor "misstated the evidence as it related to alleged statements [P]etitioner and Dron allegedly made when in the presence of Deputy Chapman[.]" Dkt. No. 4 at 50.  The prosecutor argued, with respect to Petitioner and co-defendant Dron's statements which were overheard and repeated to the jury by Chapman, "at the time the[ defendants] made these statements, there was no evidence yet that they were firing down the hill. That came from Jason Acevedo. You hadn't heard that yet."  Dkt. No. 13-2 at 462.  However, as Petitioner identifies, on October 16, 2014, Detective McGinn testified his trajectory analysis at Catherine Street directed his investigation to "a general area up the hill where . . . shell casings would be ejected from the weapon as it [wa]s discharged" and when investigators "went up the hill to that area and [they] immediately found two shell casings . . . on the sidewalk in front of 514 East Laurel Street."  Dkt. No. 13-1 at 576.

Accordingly, the prosecutor's comment that evidence had not been presented about the location where gunshots were fired prior to Petitioner and co-defendant Dron's conversation reacting to the medical examiner's testimony was not accurate.  However, Petitioner has failed to demonstrate that, had his attorney objected to the prosecutor's misstatement about the order in which the witnesses testified, the outcome would have been different.  *See Murphy v. McGuiness*, 2008 WL 4093480, at *16-17 (S.D.N.Y. Sept. 3, 2008) (finding the prosecutor's

summation did not deprive the petitioner of a fair trial noting "even if the prosecutor mis[s]poke in [one] respect, his error could not have affected the outcome of the trial.").

Both Petitioner and co-defendant Dron's attorneys argued in their respective summations that their client's statements in the holding cell evinced relief that the People had presented seemingly inconsistent evidence with respect to the gunshots' trajectory, rather than an admission of guilt. Moreover, prior to the parties' summations, the trial court instructed the jury "the lawyers are not witnesses . . . so if [a] lawyer asserts something as fact that is not based on evidence, you must disregard that" and "nothing the lawyers say during their summation is evidence." Dkt. No. 13-1 at 362. The jury is presumed to have followed the trial court's instructions and have disregarded the prosecutor's erroneous statement about the order in which the People's witnesses were called. *See generally*, *Zafiro v. United States*, 506 U.S. 534, 540-41 (1993) ("juries are presumed to follow their instructions") (quoting *Richardson v. Marsh*, 481 U.S. 200, 211 (1987)) (internal quotations omitted).

### B.  Photograph Identification

Petitioner argues habeas relief is warranted because the trial court "violated [his] federal due process rights by declining to suppress the suggestive photographic identification of Tamekia Hollister." Pet. at 9. Respondent contends Petitioner's challenge to the suggestiveness of the photo array is unexhausted, procedurally barred from habeas review, and meritless. Dkt. No. 11-1 at 24-29.

In his brief to the Appellate Division, Petitioner claimed "[t]he photo array shown to Tamekia Hollister was unduly suggestive because [Petitioner wa]s the only person wearing a conspicuous red shirt[.]" Dkt. No. 12-1 at 165-70. The Fourth Department concluded "[Petitioner] failed to preserve for our review his contention . . . that the photo array from which

a witness identified him was unduly suggestive based on [his] shirt color, thereby tainting that witness's subsequent in-court identification of [Petitioner.]" *Lundy*, 178 A.D.3d at 1390 (citation omitted). The Appellate Division further observed, "[i]n any event, the contention lacks merit." *Id*.

A "federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment.'" *Walker v. Martin*, 562 U.S. 307, 315 (2011) (quoting *Beard v. Kindler*, 558 U.S. 53, 55 (2009)) (additional citations omitted). "This rule applies whether the state law ground is substantive or procedural." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (citation omitted). Furthermore, "even when a state court says that a claim is 'not preserved for appellate review' but then rules 'in any event' on the merits, such a claim is procedurally defaulted." *Green v. Travis*, 414 F.3d 288, 294 (2d Cir. 2005) (quoting *Glenn v. Bartlett*, 98 F.3d 721, 725 (2d Cir. 1996)); *see also Hughes v. Sheahan*, 312 F. Supp. 3d 306, 340 (N.D.N.Y. 2018) (explaining "[e]ven if the state court considers the merits of an otherwise precluded claim, its reliance on a procedural ground as one basis for the denial of the claim precludes federal habeas review.") (citing *Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989)) (additional citation omitted).

The Second Circuit has explained that New York's preservation rule "is a state law ground . . . independent of any federal question[.]" *Garvey v. Duncan*, 485 F.3d 709, 720 (2d Cir. 2007). Accordingly, the Fourth Department's application of the preservation rule was independent of the question presented here, *i.e.*, whether the photograph array used to identify Petitioner was unduly suggestive.

"To qualify as an 'adequate' procedural ground, a state rule must be 'firmly established and regularly followed.'" *Walker*, 562 U.S. at 316 (citation omitted). Courts in this circuit have consistently found New York's preservation rule to be "firmly established and regularly followed." *See Downs v. Lape*, 657 F.3d 97, 104 (2d Cir. 2011) (noting "we have held repeatedly that the contemporaneous objection rule is a firmly established and regularly followed New York procedural rule" and collecting cases).

Accordingly, the Appellate Division's denial of Petitioner's suggestive identification claim based on his failure to properly preserve it as required by New York law constitutes an independent and adequate state law ground precluding habeas review. Where, as here, "a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule," the petitioner may avoid the procedural bar if he "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

Petitioner has not alleged "something external . . . that cannot fairly be attributed to him[,] . . . impeded his efforts to comply with the State's procedural rule" to establish cause for the procedural default of his claim. *Maples v. Thomas*, 565 U.S. 266, 280 (2012) (quoting *Coleman*, 501 U.S. at 750) (additional quotations and citations omitted). Nor has Petitioner proven actual prejudice, i.e., "that the error[] . . . worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *Murray v. Carrier*, 477 U.S. 478, 494 (1986) (quoting *United States v. Frady*, 456 U.S. 152, 170 (1982) (internal quotations omitted, emphasis in original). Finally, Petitioner has failed to allege, much less prove, that he is "actually innocent." *See Schlup v. Delo*, 513 U.S. 298, 327 (1995); *United*

*States v. Olano*, 507 U.S. 725, 736 (1993) ("In our collateral-review jurisprudence, the term 'miscarriage of justice' means that the defendant is actually innocent.") (citation omitted).

In sum, the Appellate Division's denial of Petitioner's suggestive identification claim under N.Y.'s preservation rule, an independent and adequate state law ground, rendered the claim procedurally barred from federal habeas review.[12] Because Petitioner has not proven cause for the procedural default and resulting prejudice or that a miscarriage of justice would result from this Court's failure to consider the claim, no relief is warranted.[13]

### C. Severance

Petitioner argues he is entitled to habeas relief because "[t]he trial court violated [his] federal due process rights by not granting [his] motion for severance[.]" Pet. at 9. Respondent contends Petitioner raised his severance claim as a violation of state law; therefore any federal constitutional claim is unexhausted, procedurally defaulted, and, in any event, meritless. Dkt. No. 11-1 at 30-35.

In his consolidated appeal, Petitioner argued County Court "should have granted the motion to sever [his] trial from that of his brother Dron . . . . Under CPL 200.40 (1)," which states: "the court . . . may for good cause shown order in its discretion that any defendant be tried separately from the other[.]" Dkt. No. 12-1 at 113-14; C.P.L. § 200.40. The Appellate Division rejected Petitioner's claim, explaining: "[Petitioner] failed to establish good cause for severance inasmuch as he failed to demonstrate 'that the core of his codefendant's alibi defense was in irreconcilable conflict with his own defense, and that there was a significant danger that the

---

[12] Because habeas review of this claim is procedurally barred on independent and adequate state law grounds, the undersigned need not consider Respondent's additional argument that Petitioner failed to properly exhaust his claim concerning the photograph identification in his application for leave to appeal to the Court of Appeals.

[13] In his Traverse, Petitioner argues his photograph identification was fully exhausted, but does not appear to contest Respondent's conclusion that the claim is barred from habeas review on an independent and adequate state law ground. *See* Traverse at 1-3.

conflict would lead the jury to infer his guilt[.]'" *Lundy*, 178 A.D.3d 1389, 1389 (quoting *People v Campbell*, 118 AD3d 1464, 1466 (4th Dept. 2014)).

To the extent Petitioner's severance claim in the instant action is based on an alleged violation of state law, it is not cognizable on federal habeas review. *Murray v. Noeth*, 2020 WL 4815972, at *4 (N.D.N.Y. Aug. 19, 2020) ("To the extent that [the petitioner] is attempting to renew his contentions made on direct appeal that the county court violated CPL §§ 200.20 and 200.40, such claim fails to raise an issue of constitutional dimension and must be denied on that basis.") (citing *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005)). Therefore, no relief is warranted irrespective of the propriety of the state court's application of C.P.L. § 200.40. *See generally*, *Estelle*, 502 U.S. at 63 ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.") (citation omitted).

Alternatively, any argument that trial court's refusal to sever Petitioner's trial from that of co-defendant Dron violated *federal constitutional law* is unexhausted. In his consolidated appeal, "[P]etitioner did not present his severance claim as a Federal constitutional claim . . . to the Appellate Division. Instead, he relied on New York State case law and statutes when he raised his severance claim[.]" *Flowers v. Noeth*, 2021 WL 4267814, at *17 (N.D.N.Y. July 27, 2021), *report and recommendation adopted*, 2021 WL 4262666 (N.D.N.Y. Sept. 20, 2021); *see also* Dkt. No. 12-1 at 113-25; Dkt. No. 12-6 at 95-99. By "limiting the scope of his claim to violations of state law," Petitioner left any federal constitutional claim concerning his joint trial "unexhausted for habeas review." *Flowers*, 2021 WL 4267814, at *17 (citing *Aparicio v. Artuz*, 269 F.3d 78, 89-90 (2d Cir. 2001)); *Martinez v. Capra*, 2016 WL 2619642, at *3 (W.D.N.Y. May 9, 2016) (finding denial of severance claim unexhausted because the "Petitioner did not

present his severance claim as a Federal constitutional claim but simply relied on New York

State law when he raised it on direct appeal.")).

As Petitioner identified, his counseled brief to the Appellate Division referenced *Cruz v.*

*New York* and *Bruton v. United States*, two cases decided by the U.S. Supreme Court.  *See* Dkt.

No. 4 at 28.[14]  However, "[i]n *Bruton*[,] . . . [the Supreme Court] held that a defendant is

deprived of his *rights under the Confrontation Clause* when his codefendant's incriminating

confession is introduced at their joint trial, even if the jury is instructed to consider that

confession only against the codefendant."  *Cruz v. New York*, 481 U.S. 186, 187-88 (1987)

(emphasis added) (citing *Bruton v. United States*, 391 U.S. 123 (1968).  Similarly, in *Cruz*, the

Supreme Court:

> [He]ld that, where a nontestifying codefendant's confession
> incriminating the defendant is not directly admissible against the
> defendant . . . *the Confrontation Clause bars its admission* at their
> joint trial, even if the jury is instructed not to consider it against the
> defendant, and even if the defendant's own confession is admitted
> against him.

*Cruz v. New York*, 481 U.S. 186, 193 (1987) (emphasis added) (citation omitted).  In other

words, neither *Bruton* nor *Cruz* opined on the constitutionality of a trial court's refusal to sever a

defendant's trial.

In sum, neither of the Confrontation Clause cases which Petitioner referenced in his

consolidated appeal "alert[ed]" the Fourth Department "to the federal nature of" his *severance*

claim.  *Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted).  Petitioner refutes

Respondent's assertion that a federal constitutional right to a separate trial is distinct from the

---

[14] *See also* Dkt. No. 12-1 at 114 ("[County Court] further found that there was no *Bruton* problem, because neither defendant implicated the other in the crime; the defenses were not antagonistic; and the claim that the evidence against Dron was stronger was insufficient[.]"), 117 ("The interlocking and corroborative nature of these statements made it much more difficult for the jury to consider them separately, and made the prosecutor's claims regarding the alleged feud that much more persuasive[.]" (citing *Cruz v. New York*, 481 US 186, 192 (1987)).

rights under the Confrontation Clause at issue in *Cruz*;[15] however, this argument is insufficient because the Petitioner's references to Confrontation Clause precedent would not have alerted the Appellate Division to a claim that *the trial court's denial of Petitioner's motion for severance violated a federal constitutional right to a separate trial.  See, e.g.*, *DeLeon v. Duncan*, 2002 WL 1997892, at *2 (S.D.N.Y. Aug. 28, 2002) (explaining "one citation to a Supreme Court case without reference to a specific federal Constitutional right did not adequately put the state court on notice of Petitioner's federal claim[.]") (citing *Gray v. Netherland*, 518 U.S. 152, 162-63 (1996)); *Shuler v. Artus*, 2016 WL 698106, at *9 (N.D.N.Y. Feb. 19, 2016) (explaining the petitioner's claim alleging a violation of New York's C.P.L. was not cognizable on habeas review and the petitioner's "passing reference to a single Supreme Court case in his appellate brief does not warrant a different outcome.") (citation omitted).

Nor did the Petitioner's contention that he was "deprived of a fair trial" without more–specifically precedent contemplating constitutional fairness requirements in the context of a joint indictment, as opposed to the admissibility of a codefendant's statements under the Confrontation Clause –alert the state court to an alleged violation of federal constitutional law. "Alleging lack of a fair trial does not convert every complaint . . . into a federal due process claim."  *Petrucelli v. Coombe*, 735 F.2d 684, 688 (2d Cir. 1984) ("a mere statement that due process rights have been violated" in a state court brief "does not necessarily give rise to a specific federal constitutional claim. 'Due process,' like 'fair trial,' can be a catchphrase used by habeas petitioners as part of an allegation about any type of trial court error, including errors in rulings based on state law.") (internal quotations and citations omitted).

---

[15] *See* Traverse at 4-5 (arguing "appellate counsel cited *Cruz* because it illustrated the constitutional *injury* petitioner suffered stemming from the joint trial" and "appellate counsel essentially took the position that, in addition to denying petitioner a fair trial, the joinder infringed a substantive federal right–e.g., the right not to be convicted based upon the inadmissible hearsay of a non-testifying codefendant.") (emphasis in original).

Even assuming Petitioner did properly alert the state courts to a constitutional claim, the cognizability of such a claim is precarious. "No Supreme Court opinion has ever addressed when severance is constitutionally mandated or how a federal habeas court should review a state court's denial of a severance motion." *Castro v. Fisher*, 2004 WL 2525876, at *5 (S.D.N.Y. Nov. 8, 2004).[16] As Petitioner has discussed, the Supreme Court's opinion in *Zafiro* has been cited by federal habeas courts "reviewing severance challenges brought by state prisoners." Dkt. No. 4 at 32 (citing cases). But,"[e]ven if *Zafiro* contains general statements concerning the risk of prejudice involved in joint trials, a federal court may grant habeas relief *only where a state court adjudication directly contradicts or unreasonably applies the holding of a Supreme Court decision, not its dicta*." *Castro*, 2004 WL 2525876, at *5 (emphasis added) (citing *Williams v. Taylor*, 529 U.S. 362, 412 (2000)). Therefore, it is not clear that Petitioner has even identified a clearly established federal right, as is required for federal habeas relief. *See Williams*, 529 U.S. at 412 (explaining "the phrase 'clearly established Federal law, as determined by the Supreme Court of the United States'" contained in 2254(d)(1) "refers to the holdings, as opposed to the dicta, of this Court's decisions as of the time of the relevant state-court decision.").

To the extent Petitioner can be said to have *properly alerted* the state courts to a *viable federal constitutional claim* that the trial court's failure to grant Petitioner's severance motion deprived him of a fair trial, his assertions are unavailing.

As an initial matter, the Supreme Court has acknowledged a "preference . . . for joint trials of defendants who are indicted together[,]" *Zafiro*, 506 at 537, as well as an immense deference to which the trial court's decision regarding joint trials are entitled, noting it is "within

---

[16] Petitioner cites to the Supreme Court's opinion in *Zafiro v. United States*, wherein the Court assessed "whether Rule 14 [of the Federal Rules of Criminal Procedure] requires severance as a matter of law when codefendants present 'mutually antagonistic defenses.'" 506 U.S. 534, 535 (1993); *see also Castro*, 2004 WL 2525876, at *5 ("The holding in *Zafiro* solely concerns when severance is required under Rule 14, Fed.R.Crim.P.").

the sound discretion of the trial judge . . . whether the defendants should be tried together or severally[,]" *Opper v. United States*, 348 U.S. 84, 95 (1954). "[T]he Court has long recognized that joint trials 'conserve state funds, diminish inconvenience to witnesses and public authorities, and avoid delays in bringing those accused of crime to trial.'" *United States v. Lane*, 474 U.S. 438, 449 (1986) (quoting *Bruton*, 391 U.S. at 134); *see also Zafiro*, 506 at 537 (identifying the "vital role" joint trials play in the criminal justice system as they "promote efficiency and serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts.") (internal quotations and citations omitted).

Next, Petitioner and co-defendant Dron's defenses were not "'mutually antagonistic' or 'irreconcilable' defenses[.]" *See Zafiro*, 506 U.S. at 538; *see also United States v. Lloyd*, 859 F. Supp. 2d 387, 393 (E.D.N.Y. 2012) (explaining defendants present "'antagonistic defense[s]' where the defendants accuse each other of committing the crime"). Rather, both defendants argued they did not kill Belle in retaliation for a conflict between the brothers and Belle's friends and the eyewitness testimony presented by the People's witnesses was not credible. To be sure, even if co-defendant Dron *had* accused Petitioner of Belle's murder, the Supreme Court's holding in *Zafiro* would not preclude the trial court's denial of Petitioner's severance motion. *See Zafiro*, 506 U.S. at 538 (declining "to adopt a bright-line rule, mandating severance whenever codefendants have conflicting defenses."); *Lloyd*, 859 F. Supp. 2d at 393 ("Even in that type of situation, where the defendants accuse each other of committing the charged crime, severance is not required.").

Alternatively, Petitioner contends the trial court's denial of his motion for severance and Appellate Division's affirmance thereof contradicted and unreasonably applied the Supreme Court's holding in *Zafiro* because:

48

Despite concluding that petitioner had not shown that "the core of [Dron's] alibi defense was in irreconcilable conflict with his own defense" . . . the Appellate Division failed to engage in the holistic inquiry commanded by *Zafiro* and it[s] progeny. As *Zafiro* explains, "[t]he risk of prejudice will vary with the facts of each case," and thus trial courts "may find prejudice in situations" the Court previously had "not discussed" . . . In other words, even if petitioner's and Dron's defenses were not in "irreconcilable conflict"–which is not true–that conclusion, standing alone, is hardly dispositive of whether joinder is appropriate . . . because the Appellate Division, in evaluating petitioner's severance challenge, employed an analysis considerably narrower than what the Supreme Court endorsed in *Zafiro*, petitioner submits that the underlying state court decision was "contrary to . . . clearly established Federal Law."

Dkt. No. 4 at 30 (emphasis and citations omitted).  In sum, Petitioner's argument is that *Zafiro* held a criminal defendant "may" be prejudiced by a joint trial, even where his defense is not in "irreconcilable conflict" with that of his co-defendant; therefore, the state courts' decision denying Petitioner's severance motion, which noted Petitioner's defense was not in "irreconcilable conflict" with co-defendant Dron's, was "contrary to" *Zafiro* because the remaining constellation of factual circumstances placed Petitioner's trial under the umbrella of "other situations" where a defendant was prejudiced by his joint trial not specifically articulated by the Supreme Court.

While the Supreme Court's Opinion in *Zafiro* certainly left open the possibility that a criminal defendant could be substantially prejudiced where "[f]or example, evidence of a codefendant's wrongdoing . . . erroneously could lead a jury to conclude that a defendant was guilty" or "[e]vidence that is probative of a defendant's guilt but technically admissible only against a codefendant" is admitted, it did *not* hold severance was required in such a case.  *Zafiro*, 506 U.S. at 539.  Instead, the Court noted "less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice" and observed "defendants are not entitled to

49

severance merely because they may have a better chance of acquittal in separate trials." *Id*. at 539-40 (citations omitted).

Significantly, Petitioner has not identified case law supporting his theory that *Zafiro* could be read as requiring severance in a situation other than one where the defendants presented antagonistic defenses.  On the contrary, the Second Circuit has held "separate trials are required only upon a showing that 'the jury, in order to believe the core of testimony offered on behalf of [one] defendant, must necessarily disbelieve the testimony offered on behalf of his codefendant.'" *Grant v. Hoke*, 921 F.2d 28, 31 (2d Cir. 1990) (additional quotations and citations omitted).  Indeed, the Judge in *Pineda*, which Petitioner cites in support of his proposition that the Supreme Court's decision in *Zafiro* is applicable in the context of a petition for federal habeas corpus relief, concluded "Petitioner must show that 'the jury, in order to believe the core of testimony offered on behalf of [one] defendant, must necessarily disbelieve the testimony offered on behalf of his co-defendant.'" *Pineda*, 2006 WL 2239105 at *17 (quoting *Grant*, 921 F.2d at 31); *see also*, *e.g.*, *Murray*, 2020 WL 4815972, at *4 ("'separate trials are required only upon a showing that the jury, in order to believe the core of testimony offered on behalf of one defendant, must necessarily disbelieve the testimony offered on behalf of his codefendant.'") (quoting *Grant*, 921 F.2d at 31).

Additionally, irrespective of the type of prejudice which a convicted defendant claims to have suffered as a result of his joint trial, it is extremely difficult to satisfy the "prejudice" standard.  *See*, *e.g.*, *Zafiro*, 506 U.S. at 539 (observing "courts have reversed relatively few convictions for failure to grant a severance" and identifying the difficulty of demonstrating prejudice as a potential cause for the infrequency of reversals of convictions based on the denial of a defendant's request for a separate trial); *Branch v. Marshall*, 2010 WL 5158632, at *9

50

(S.D.N.Y. Oct. 12, 2010) (noting "A petitioner claiming a due process violation as a result of the denial of severance must demonstrate that 'actual prejudice resulted from the events as they unfolded during the joint trial'" and explaining "[a] finding of actual prejudice is rare") (internal quotations and citations omitted), *report and recommendation adopted*, 2010 WL 5158633 (S.D.N.Y. Dec. 16, 2010); *Calhoun v. Walker*, 1999 WL 33504437, at *3 (N.D.N.Y. Feb. 26, 1999) ("In federal proceedings . . . A defendant who challenges the denial of a severance motion must establish that he was so severely prejudiced by the joinder as to have been denied a fair trial . . . In a habeas proceeding, the Petitioner must demonstrate *at least this much*.") (emphasis added, internal quotations and citations omitted).

In any event, while Petitioner enumerates multiple instances of tension between himself and co-defendant Dron, as well as facts supporting his conclusion that the People's case against co-defendant Dron was stronger than the case against himself, this tension has not only been contemplated by federal courts assessing severance but identified as an expectation in a joint trial. *See*, *e.g.*, *Williams v. Moscicki*, 2014 WL 1277400, at *7 (E.D.N.Y. Mar. 27, 2014) ("incidental prejudice is often present when multiple defendants are tried together . . . [therefore,] a simple showing of some antagonism or that defendant might have had a better chance for acquittal at a separate trial is not sufficient[.]") (internal quotations and citations omitted); *Mercedes v. Herbert*, 2002 WL 826809, at *5 (S.D.N.Y. Apr. 30, 2002) (explaining "[i]ncidental prejudice, which is almost always present when multiple defendants who played different roles are tried together, will not be enough" to demonstrate a defendant was so severely prejudiced by joinder as to have been denied a fair trial) (citing *United States v. Martinez*, 922 F.3d 914, 922 (1st Cir. 1991)).

Furthermore, contrary to Petitioner's assertion that the jurors lacked "the kind of precision needed to parse the interlocking evidence" presented at trial and "could not be expected [to] slice the salami that thin"– Dkt. No. 4 at 32 –two of the cases upon which Petitioner relies, *Garcia* and *Zafiro*, direct courts to trust that juries are capable of understanding and abiding by a trial court's limiting instruction to consider the evidence against each of the defendants separately.  *See Zafiro*, 506 U.S. at 539 ("limiting instructions[] often will suffice to cure any risk of prejudice) (citation omitted); *Garcia*, 2010 WL 1816333 at *11 ("any potential prejudice resulting from a joint trial was cured by the trial court's jury instructions . . . that 'there [we]re two defendants on trial . . . [and t]he evidence as to each [defendant] must be evaluated separately.'") (collecting cases); *see also Williams*, 2014 WL 1277400, at *7 ("Any risk of prejudice was alleviated by the[ trial court's] instructions" to render a separate verdict with respect to each defendant) (citations omitted).  Therefore, to the extent there was a disparity between the volume and/or strength of the evidence presented against each defendant, any prejudice was cured by County Court's instructions that "[i]t [wa]s [the jury's] obligation to evaluate the evidence as it applies or fails to apply to each defendant separately[,]" the jury "must return a separate verdict for each defendant and those verdicts may be but need not be the same[,]" and it was the jury's "sworn duty to give separate consideration to the case of each individual defendant."  Dkt. No. 13-2 at 488-89; *see also* Dkt. No. 13-2 at 491-92 (repeating the instruction with respect to the remaining charges).

Finally, the jurors requests to have various portions of testimony read back as well as the fact that the jurors reached a verdict as to the charges against co-defendant Dron, were read an *Allen* charge, continued deliberating, *and then* returned a verdict as to Petitioner's guilt the following day demonstrates the jurors considered the evidence against each defendant separately,

as instructed. *See Council v. Capra*, 2015 WL 13746663, at *21 (S.D.N.Y. Sept. 24, 2015) ("the jurors clearly considered each defendant's role separately, as evidenced by several of their notes . . . and by the fact that they first reached verdicts as to four of the defendants . . . and then separately reached verdicts the next day" as to the remaining defendant's charges), *report and recommendation adopted*, 2016 WL 165022 (S.D.N.Y. Jan. 14, 2016).

In sum, to the extent Petitioner's arguments amounted to a properly exhausted and cognizable constitutional claim that he suffered prejudice– specifically the kind of prejudice contemplated in *Zafiro*'s catch-all provision but not explicitly articulated in that decision –as a result of his joint trial with co-defendant Dron, the undersigned is not persuaded that the Appellate Division's rejection of Petitioner's severance claim either *directly contradicted* or *unreasonably applied* clearly established federal law and/or the Supreme Court's holding in *Zafiro*. Therefore, federal habeas relief is not warranted.

### D. Denial of Motion to Vacate Without a Hearing

In his memorandum of law, Petitioner asserts "[a]t the very minimum, [he] was entitled to a hearing" concerning counsel's failure to call Bloodworth and Massard as witnesses. Dkt. No. 4 at 45. In his Traverse, Petitioner clarified "[he] is arguing that, under the circumstances, the state court's resolution of [Petitioner's] ineffectiveness claim was 'contrary to' clearly established federal law because the court never afforded him an evidentiary hearing." Traverse at 8. Respondent avers such a claim was not properly presented to this court and, in any event, provides no basis for federal habeas relief. Dkt. No. 11-1 at 50.

"As the Supreme Court has recognized, the Constitution does not compel states to provide post-conviction proceedings for relief." *Word v. Lord*, 648 F.3d 129, 131 (2d Cir. 2011); *see also Lackawanna Cnty. Dist. Att'y v. Coss*, 532 U.S. 394, 402 (2001) ("each State has created

mechanisms for both direct appeal and state postconviction review . . . even though there is no constitutional mandate that they do so") (citing *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987)).  Therefore, "alleged errors in a postconviction proceeding are not grounds for § 2254 review because federal law does not require states to provide a post-conviction mechanism for seeking relief." *Word*, 648 F.3d at 132.  Petitioner's argument, that the state court's failure to conduct a hearing to assess counsel's decision not to call Bloodworth and Massard to testify was contrary to the Supreme Court's holding in *Strickland*,[17] is plainly incorrect.  *See*, *e.g.*, *Major v. Lamanna*, 2021 WL 4267851, at *30 (N.D.N.Y. Sept. 3, 2021) ("to the extent Petitioner is also challenging any procedural errors, including his claim that the 440 court denied the motion without holding a hearing, those claims are also not cognizable on habeas review.") (collecting cases), *report and recommendation adopted*, 2021 WL 4263148 (N.D.N.Y. Sept. 20, 2021).

In sum, Petitioner's claim that the state court erred in denying his post-conviction motion without conducting a hearing is not cognizable on habeas review.  *See Green v. Haggett*, 2014 WL 3778587, at *8 (N.D.N.Y. July 31, 2014) (citing *Word*, 648 F.3d at 132) (additional citations omitted) ("Petitioner's claim is that there was a procedural defect in the conduct of a state post-conviction proceeding, because the trial court failed to hold a hearing, and federal habeas relief is not available for such alleged defects.").  Accordingly, no relief is warranted.[18]

## V.    CONCLUSION

**WHEREFORE**, it is

**RECOMMENDED** that the petition, Dkt. No. 1, be **DENIED and DISMISSED** in its entirety; and it is further

---

[17] *See* Traverse at 8-9.
[18] Because this claim presents no basis upon which federal habeas relief could be granted, the undersigned need not address Respondent's additional argument that Petitioner's claim was not properly before this Court.

**RECOMMENDED** that no Certificate of Appealability ("COA") shall issue because reasonable jurists would not find it debatable that Petitioner has failed to offer a substantial showing that he was denied a constitutional right.  *See* 28 U.S.C. § 2253(c); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000).

**ORDERED** that the Clerk shall serve a copy of this Report-Recommendation and Order on Petitioner, along with copies of unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**.  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72 & 6(a).

Dated: January 31, 2024
       Albany, New York

Daniel J. Stewart
U.S. Magistrate Judge